FRIEDERS, Respondent, vs. ESTATE OF FRIEDERS, Appellant.

*January 10—May 1, 1923.*

*Wills: Contract to make provision in will: Breach: Measure of damages: Surrender of right under workmen's compensation act: Release of rights under act.*

1. The measure of damages for breach of a contract to make provision for a person by way of a legacy in a will is not the amount of the legacy agreed to be given, but the value of the consideration surrendered for the promise, since under that rule the promisee is protected from losing the right to recover the consideration surrendered by the running of the period of limitations before the testator's death, and to permit the recovery of the amount of the promised legacy would open the door for fraudulent claims based on oral promises of legacies, contrary to the purpose of the statute prescribing the manner in which wills must be executed.

2. Where an injured employee agreed to waive his right to compensation in consideration of the promise of his employer, who was his uncle, to make provision in his will for him so that he would not have to work again, a release executed by the employee discharging the employer and the insurance company from any demands upon them by reason of the accident, but which did not pretend to be a release of damages arising from the breach of the contract, does not bar recovery for the breach of the contract to make the legacy.

3. A release executed without fraud, coercion, or undue influence cannot be ignored merely because it is improvident.

4. Where the employee agreed not to claim compensation from his employer for his injuries in consideration of the employer's promise to provide for him by will, and it was admitted that the employee was entitled to compensation under the workmen's compensation act, the measure of damages upon the breach of the agreement was the amount of compensation to which the employee would have been entitled under the act.

CROWNHART and ESCHWEILER, JJ., dissent.

APPEAL from a judgment of the circuit court for Waupaca county: BYRON B. PARK, Circuit Judge. *Reversed.*

During the month of February, 1914, *Tony Frieders* was an employee of his uncle, John Frieders, now deceased, work-

ing in a logging camp near Elmhurst. While in the performance of duties incident to his employment he sustained personal injuries and was removed to a hospital at Clintonville. The evidence tends to show that while he was in the hospital his uncle called on him and told him that if he would not make any trouble because of the injury he would leave him enough money in his will so that he would not have to work the rest of his life, and promised to take care of the doctor and hospital bill and care for him in every way. Within a few weeks the Travelers Insurance Company, in which decedent carried compensation insurance, commenced paying to the plaintiff, and he accepted, weekly allowances in the manner provided by the workmen's compensation act, and such payments were continued, and regularly accepted, by plaintiff until July 8, 1914, when the final payment was made to him and he executed a paper in the nature of a final release of the insurance company and of John Frieders, his uncle. The uncle died intestate.

This action was brought against the estate to recover for the breach of the agreement made by the uncle to provide for *Tony* in the will, so that he would not be required to work during the rest of his life. Fifty thousand dollars was demanded. The case was tried before a jury and the following special verdict returned:

"(1) What sum will compensate *Tony Frieders* for the injuries he received February 17, 1914? *A*. $4,000.

"(2) What sum will compensate *Tony Frieders* for the failure of John Frieders to keep his agreement to provide for *Tony Frieders* in his will? *A*. $38,000."

Upon this verdict judgment was rendered against the estate in the sum of $30,000, from which judgment the estate brings this appeal.

*Llewellyn Cole* of Clintonville, for the appellant.

For the respondent there was a brief by *Brunner & Brunner* of Clintonville, attorneys, and *P. H. Martin* of

Green Bay, of counsel, and oral argument by *Mr. Martin*, *Marie A. Brunner*, and *S. W. Brunner*.

The following opinion was filed March 6, 1923:

Owen, J.  At the time of the injury to the plaintiff he and his employer, the deceased uncle, were concededly subject to the provisions of the workmen's compensation act.  Immediately upon the injury, therefore, a liability was imposed by law upon the uncle, now deceased, to make compensation for such injuries according to the rates and schedules provided in that act.  The amount of the liability thus imposed could have been quite easily and definitely determined.  For the present purposes it is quite safe to say that it would not have exceeded $5,000.  The jury found that $4,000 was reasonable compensation for the injury sustained.  At a time, therefore, when the deceased uncle was under a legal obligation to the plaintiff in an amount not to exceed $5,000, he agreed with the plaintiff that if he would make him no trouble because of the injuries sustained he would make provision for him in his will so that he, the plaintiff, would never have to work.  He died without making such a provision, and the question is, What is the measure of plaintiff's damages for the breach of the contract?

In *Murtha v. Donohoo*, 149 Wis. 481, 134 N. W. 406, 136 N. W. 158, it appeared that the claimant had supplied the deceased, during a period of six years, with food, shelter, clothing, and money, the aggregate amount of which does not appear.  This was all furnished prior to 1898.  During the spring of 1901 the deceased promised claimant that he would give him by his last will the sum of $1,000 for what he had done for him.  He died leaving no such provision in his will.  Claimant sought to recover the $1,000 so promised.  The court held that the agreement was valid and binding, but that the measure of damages was the value of the executed consideration for the agreement and not the amount

of the promised legacy, the court saying: "In a case like the present, where the promise to compensate by legacy is based upon a past or executed consideration, the recovery must be limited to the amount of the demand so to be compensated, or the reasonable value thereof where the amount is not fixed and definite." We can see no substantial, if indeed there be any shadow of, distinction between this and the *Murtha Case.* In both cases that which gave rise to a liability on the part of the deceased to the claimant had occurred before the promise was made. In the *Murtha Case* the courtesies, consisting of food, shelter, clothing, and money which founded the consideration for the promise, had all been contributed prior to the promise to compensate in the form of a legacy. Here the injury which formed the consideration and constituted the reason and motive for the promise had occurred and liability had already attached. In neither case, however, was there any consideration for the promise to compensate beyond the amount of legal liability except the implied or perhaps express promise to forbear enforcement of an existing legal right. In the instant case that consideration was out of all reasonable proportion to the amount promised over and above the actual legal liability, and to permit a recovery of $30,000 is practically tantamount to the enforcement of a naked promise to make a bequest.

The statute prescribing the manner in which wills shall be executed is in the nature of a statute of frauds. Perhaps no other legal document requires such solemnity in the manner of its execution. This is for the purpose of securing the highest degree of assurance that the testator's-property will go as he wills it and to make it correspondingly difficult to divert it into other channels. To permit this judgment to stand would open up an alluring field for frauds and perjuries and neutralize to a great degree the safeguards which the statute throws about the estates of deceased persons. It would permit any one having a claim against an

estate of a deceased person, and being fraudulently disposed, to manufacture evidence to show that the enforcement of the claim was postponed because of an oral promise made by the testator that he would liquidate the claim by a provision in his will, and the estate of a testator would not go according to his written direction executed in accordance with the solemnities required by the statute but according to parol testimony produced at a time when the testator cannot be present to refute it. While justice might be done in the instant case, a recognition of such a rule would point the way for the contravention of a statute designed by the legislature to prevent the distribution of estates except in accordance with the will of the testator. It would be a most dangerous rule, subversive of public policy and destructive of the legislative will. As was said of the rule embodied in sec. 4069, Stats., by Mr. Justice Barnes in *Dilger v. Estate of McQuade,* 158 Wis. 328, 148 N. W. 1085:

"Meritorious claims may occasionally be lost by the enforcement of such a rule, but the trumped-up claims that may be defeated by it will in all probability form a much more numerous class."

The rule of the *Murtha Case* responds to every call of justice. It recognizes the validity of the contract, it postpones the running of the statute of limitations until the death of the testator, it allows as damages for the breach the full value of the services rendered or any other consideration passing from the claimant to the testator upon which the original claim rests. To allow more is to enforce a promised legacy, which should be recognized only when created in the manner required by statute. While in reaching our conclusion no reliance is placed thereon, it is proper to refer to the fact that the element of consideration mentioned in the *Murtha Case* as passing from the deceased to the claimant as supporting the extension of the time of payment which took the contract out of the statute of frauds, namely, the

personal use and enjoyment by the promisor of the property during his life, is not present in this case. The deceased carried liability insurance which fully indemnified him against any liability because of the injury sustained by the claimant. No benefit or advantage resulted to the deceased from the forbearance of the claimant. The only disadvantage suffered by the claimant was a postponement of the time of recovery which the law measures in the terms of interest.

We regard the rule of the *Murtha Case* as sound in policy, consistent with the spirit and purpose of the statute regulating the execution of wills, one which yields to the claimant full compensation for any claim he may have against the deceased, resulting in injustice to no one. This general subject is treated in a note to be found in 41 L. R. A. n. s. 246. Most of the cases there cited have been examined and no case has been found where the measure of damages for the breach of an agreement to compensate for an existing liability has been held to be anything but the value of the original claim. It necessarily follows that the judgment for $30,000 cannot be sustained.

The question now arises whether plaintiff is entitled to recover in any amount. As appears from the statement of facts, the insurance company which indemnified the employer under the workmen's compensation act paid the claimant in small weekly sums a total of $163.80. Upon the payment of the last instalment the plaintiff signed a release, in which appears this language:

"I hereby release and forever discharge the said insurance company and my said employer from any and all actions, causes of action, claims or demands, for, upon, or by reason of the accident suffered by me on or about the 17th day of February, 1914, and while in the employment of said employer, which caused a disability until the 11th day of July, 1914."

Does this release bar a recovery on the part of the plaint-

iff for a breach of the contract under consideration? It is apparent from the record that the sum of $163.80 was grossly inadequate to compensate the plaintiff even under the compensation act for the injury sustained, and to enforce it would be unconscionable. It is true that a release executed without fraud, coercion, or undue influence, even though it may be an improvident settlement, cannot be ignored merely for the reason that it is inadequate. However, we are relieved of the necessity of inquiring whether the release was procured by fraud or imposition because, whether it was or not, it does not pretend to be a release of damages arising from a breach of the contract which constitutes the subject of this action. Granting that it constitutes a release from liability arising under the workmen's compensation act, the liability sought to be enforced here arises from a breach of a contract and it does not operate to release that liability.

The question then is, What is the measure of plaintiff's damages? Manifestly it is the amount to which he would have been entitled under the provisions of the workmen's compensation act for the injuries which he sustained. The case was not tried on that theory and the verdict does not indicate the amount to which plaintiff is entitled. We hold that he is entitled to recover the amount to which he would be entitled under the provisions of the workmen's compensation act, with interest from the date when in the ordinary course he would have received such compensation, to ascertain which a new trial is necessary.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.

ESCHWEILER, J., dissents.

The following opinion was filed April 3, 1923:

CROWNHART, J. (*dissenting*). I am deeply impressed that the decision of this court does the plaintiff a grave

injustice and violates the fundamental law of contracts. It impairs the obligation of a contract, denies the plaintiff his right under a contract freely made pursuant to sound public policy as heretofore declared, substitutes for the contract made by the parties one made by this court and one the parties never contemplated and of which they never thought or considered in any way.

The right of contract is as old as civilization. Freedom of contract is a fundamental principle of our government. So long as the contract is consonant with sound public policy as determined by our laws, and made pursuant thereto, no court has a right to impeach its obligation nor to substitute the obligation of the contract for an obligation prepared by the court without reference to the contract obligation. These principles are so well established by the decisions of the courts and by constitutional guaranties that no court has heretofore attempted to gainsay them. To get a proper perspective it is well to state the facts of the case simply and plainly.

In January, 1914, John Frieders had a hotel at Clintonville and a farm near by, where he lived. He was an aged bachelor, worth over $100,000. *Tony Frieders* was his nephew, who had his home with his parents on a farm near Stratford. He was a favored relative of his uncle. His mother was a sister of John Frieders. At his uncle's request *Tony* had frequently visited the uncle and worked for him on the uncle's farm. In October, 1913, at the request of the uncle, *Tony* went to live with his uncle and work for him on the farm. In January, 1914, the uncle sent *Tony* to work in the woods at Elmhurst, hauling logs. The work was unfamiliar to *Tony*, and was a dangerous occupation. *Tony* was thrown from a high load, one log rolled upon him, resulting in very serious injuries, because of which *Tony* was sent to a hospital by the uncle. *Tony* suffered much, and he became crippled for life. He was about twenty-one years of age at the time of the accident. John Frieders was greatly disturbed over the injuries to *Tony*. He blamed

himself for sending *Tony* into the dangerous occupation, and felt that his sister, *Tony's* mother, would blame him. He thereupon took two young men as witnesses, repaired to the hospital, where *Tony* lay upon his bed of pain. He there proposed to *Tony* that if *Tony* would not sue him or make him trouble, he, John Frieders, would take care of *Tony's* expense and would provide in his will a bequest sufficient so that *Tony* would not need to work any more after the uncle's death. To this *Tony* agreed, and the two men, according to an ancient custom, solemnly shook hands on the bargain. The contract was completed and *Tony* in good faith abided by his covenant for seven long years, looking to the future for those comforts that had been denied him as a result of the accident. The proof is abundant that John Frieders was well satisfied with his bargain and fully intended to carry it out in good faith. However, an accident suddenly carried him off before he had made his will and thus his contract was breached. *Tony* thereupon presented his claim to the administrator of the deceased uncle's estate. On the trial in the circuit court the jury awarded *Tony* a verdict of $38,000, which the trial court cut to $30,000. From the judgment entered thereon defendant appeals.

Here this court finds that the contract was voluntarily and freely entered into; that it was based on a sufficient consideration; that it was breached by the decedent; and that *Tony* is entitled to damages.

The sole question here is the measure of damages. To reach its most extraordinary conclusion, as I see it, the court conjures up ogres of fraud and perjury to rob estates, and then proceeds to balk the thus created monsters by a newly-declared public policy,—a policy contrary to the common law, contrary to the constitutions and the statutes, and contrary to the principles of justice oft repeated in both courts of law and equity. The public policy so declared in this case is that the court will set aside the obligation of the contract

agreed upon by the parties and substitute one more to the
liking of the court.   In other words, the court rewrites the
contract and imposes a new obligation not agreed to nor
considered by the parties.   This I contend is a violation of
the public policy of this country from its foundation.   By
its organic law it was provided that no state should pass any
law impairing the obligations of contracts (sec. 10, art. I),
and sixty years later our state constitution provided that no
law impairing the obligations of contracts shall ever be
passed (sec. 12, art. I), and then, to further emphasize the
law of contracts, it was provided by the constitution that
the common law shall be a part of the law of the state until
repealed or amended by the legislature (sec. 13, art. XIV).
As here used the term "common law" has the enlarged sense
of embracing those rules of law and equity which embraced
the judicial system of England at the time of the separation
of this country from the English government, and such
parts thereof as had been enforced in the territory of Wis-
consin prior to the adoption of our constitution.   Equitable
principles, so far as applicable to our conditions and not
changed by statute, have been adopted as a part of our com-
mon law.   12 Corp. Jur. §§ 12 and 20, tit. "Common Law."

The policy of the common law as to the class of contracts
here being considered is stated thus:

"An agreement by which a person obligates himself, for
a valuable consideration, to devise or bequeath property to
the other contracting party is in *no respect contrary to
principles of public policy.*  (The italics are the author's.)
The specific performance of such a contract will be granted
in equity against the personal representatives of the prom-
isor; for courts of equity have, from time immemorial,
possessed jurisdiction in such a case to carry out the inten-
tion of the parties and to afford a remedy where the remedy
at law is clearly inadequate.   Equity will not make a will to
take the place of that which has not been made.   But, acting
upon well-recognized principles, the court of equity will

fasten a trust upon the estate of the promisor in favor of the promisee which will attach to that estate in the hands of his heirs, executor, next of kin, or other persons, and which will be enforceable against them.   In such a condition of affairs a court of equity will compel the legal owner of the property, who takes by descent or devolution from the promisor, to execute a conveyance of the property to the promisee." 1 Underhill, Wills, § 286.

Restatement of rule:

"The law permits a man to dispose of his own property at his pleasure, and no good reason can be assigned why he may not make a legal agreement to dispose of his property to a particular individual, or for a particular purpose, as well by will as by a conveyance to be made at some specified future period or upon the happening of some future event. It may be unwise for a man, in this way, to embarrass himself as to the final disposition of his property, but he is the disposer, by law, of his own fortune, and the sole and best judge as to the time and manner of disposing it." *Johnson v. Hubbell*, 10 N. J. Eq. 332, 335, 66 Am. Dec. 773. 40 Cyc. 1064.

"The validity of a contract by which one of the contracting parties agrees with the other, either for a good or a valuable consideration, that he will make a will devising him property, whether real or personal, is valid beyond doubt. Such contracts have been sustained and enforced in England and America from the earliest times.

"The rules of law which are applicable to the subject of contracts generally are applicable to these agreements. . . ." 1 Underhill, Wills, § 285.

"A valid and enforceable agreement by one party to devise or bequeath certain property to another party calls for *performance according to its terms,* and is not satisfied by a devise or legacy of property of less value than that agreed upon, or of a smaller estate, or upon conditions, when the agreement was for an absolute and unconditional bequest."   40 Cyc. 1067.

"Agreements to make wills are construed as other contracts in accordance with the expressed intention of the parties, and will include property acquired after the contract

where the contract covers estate remaining at death, and may make valid a devise made in accordance with it which would otherwise be void." 40 Cyc. 1066, 1067; *Daily v. Minnick,* 117 Iowa, 563, 91 N. W. 913.

"A person may make a valid contract to dispose of his property by will in a particular way, and such contract will be enforceable." 40 Cyc. 1063.

"The party who claims the property of the deceased under the contract may waive his equitable remedy and sue the executor for the value of the services rendered, or for damages for the breach of the contract." 1 Underhill, Wills, § 287.

"The measure of damages recoverable for nonperformance of a contract to bequeath or devise property is dependent on the form of action. In an action for damages for breach of contract, the measure of damages is the value of the property agreed to be devised or bequeathed, and not the value of services rendered or other consideration furnished by the promisee, while in an action upon a *quantum meruit* to recover the value of services rendered by the promisee, the value of such services is the amount plaintiff is entitled to recover, provided, according to some cases, such value does not exceed the value of the property agreed to be devised." 40 Cyc. 1073; 3 Sutherland, Damages (4th ed.) § 679; Sedgwick, Damages (9th ed.) § 606a.

In an action for breach of contract to make a legacy, the amount that would have been received if the contract had been kept is the measure of damages when the contract is broken. 8 Ruling Case Law, 452, and cases cited.

"As is shown in another part of this work, contracts of this character may, after the death of the promisor, be enforced by bill in equity by fastening a trust on the property in the hands of the heirs, devisees, and personal representatives, and others holding the property with notice of the contract as volunteers. This remedy, however, is not exclusive. An action at law for breach of contract will lie, or the promisee may recover on the common counts for services rendered." 40 Cyc. 1070.

"An agreement based upon a valuable consideration to make a particular disposition of property by will will not be

allowed to be defeated by conveyance during the lifetime of the decedent or by will, and one may sue in equity to establish a contract by defendant to will property to him, and to prevent conveyance of the property to another." 40 Cyc. 1068, 1069.

This court now repudiates these general principles universally established, and for what reason? Because "to permit this judgment to stand would open up an alluring field for frauds and perjuries and neutralize to a great degree the safeguards which the statute [relating to wills] throws about the estates of deceased persons." For hundreds' of years the law has been uniformly upheld without any such alluring fields having been explored to the public detriment. The courts have anticipated impositions on estates of deceased persons by requiring proof of claims to be clear and satisfactory. *Dilger v. Estate of McQuade,* 158 Wis. 328, 148 N. W. 1085; *Winke v. Olson,* 164 Wis. 427, 160 N. W. 164. And the legislature has safeguarded estates of deceased persons by not permitting claims to be proved by the claimant through conversations with the deceased. Secs. 4069, 4070, Stats. No such consideration for the protection of estates moved the court in *Seaman v. Estate of McNamara, post,* p. 609, 193 N. W. 377.

The supreme court of this state has upheld contracts for bequests by will since an early date. In *Bayliss v. Estate of Pricture,* 24 Wis. 651, Mr. Justice PAINE said:

"It is not disputed that in law the claimant is entitled to recover of the estate enough to make up what his services were reasonably worth, provided they were rendered upon an understanding that they were to be compensated, in part at least, by a testamentary provision, no such provision having in fact been made."

It appears that a specific bequest was not allowed in that case because of failure of proof, but recovery on *quantum meruit* was allowed.

In *Jilson v. Gilbert,* 26 Wis. 637, in an opinion by Mr. Chief Justice DIXON, a contract to reward by will was upheld, and, quoting from a New York case, he said: "This was the clearest possible recognition of the validity of such agreements."

In *Slater v. Estate of Cook,* 93 Wis. 104, 67 N. W. 15, recovery was allowed upon *quantum meruit* for services, but it is clearly implied that if proof had been sufficient plaintiff could have recovered for breach of contract to bequeath by will all the estate of deceased.

In *Murtha v. Donohoo,* 149 Wis. 481, 134 N. W. 406, 136 N. W. 158, a claim was allowed for services on *quantum meruit* instead of upon a promise to bequeath by will because, as the court there held, the promise was based upon an executed or past consideration and hence such consideration formed no basis for the new promise. This distinction must be borne in mind, for the same Justices who participated in the decision of the case of *Murtha v. Donohoo* later decided the case of *Dilger v. Estate of McQuade,* 158 Wis. 328, 148 N. W. 1085, and in an opinion by Mr. Justice BARNES in the latter case, concurred in by the whole court, it was held:

"An oral contract based on a valid consideration to leave the promisee a legacy in personal property is lawful and enforceable. *Jilson v. Gilbert,* 26 Wis. 637; *Slater v. Estate of Cook,* 93 Wis. 104, 67 N. W. 15; *Murtha v. Donohoo,* 149 Wis. 481, 484, 134 N. W. 406, 136 N. W. 158. It logically follows that a written contract founded on a valuable consideration to leave real estate would likewise be valid and capable of enforcement."

In that case the plaintiff, when she was eight months old, was given into the custody of McQuade under a promise by McQuade that he would leave her all his property after the death of himself and his wife. At the time as well as at the time of his death he owned some real estate and personal

property.   He died intestate without heirs.   The net value of his estate was less than $10,000.   The plaintiff filed a claim against the estate for $10,000 damages for breach of contract, and judgment was rendered in the county court awarding the claimant such sum as remained after debts and expenses of administration were paid.   On appeal in the circuit court the court held that the suit was in the nature of specific performance of a contract to convey real estate, and considered the verdict of the jury as merely advisory.   The verdict in the county court finding in favor of the plaintiff was set aside by the trial court as against the clear preponderance of the testimony.   In considering this action of the trial court Mr. Justice BARNES said:

"If there was a valid contract, no good reason is apparent why the plaintiff might not elect to sue for damages for its breach."

He then proceeded to show that it was an action for breach of contract and triable by jury, and the judgment of the lower court was reversed, with directions to enter judgment on the verdict.   The verdict so sustained was for all the balance of the estate of McQuade after his debts were paid. Now it should be noted that this was not an action on *quantum meruit*.   It was an action for breach of contract for failure to bequeath property by will, and the damages were assessed under the rule laid down in 8 Ruling Case Law, 452, heretofore cited.

The distinction between an action on *quantum meruit* for services rendered and the case at bar for breach of contract in the settlement of a claim for personal injuries is well stated in *Estate of Leu,* 172 Wis. 530, 535, 179 N. W. 796, as follows:

"These cases firmly establish the principle that the cause of action accrues when the services are rendered, as in other cases of implied contract, and the person rendering such services may maintain an action upon them at any time."

In the instant case there can be no doubt but the contract in express terms postponed the claim under an express contract until the death of the uncle. Here there is either a claim under an express contract or there is no claim at all. There is no implied contract. Compensation is a statutory obligation and it is not based on implied contract.

The whole basis of business has been built upon the law of contracts. In 1 Parsons, Contracts (9th ed.) pp. 3, 4, and 5, it is stated:

"The law of contracts, in its widest extent, may be regarded as including nearly all the law which regulates the relations of human life. Indeed, it may be looked upon as the basis of human society. All social life presumes it, and rests upon it; for out of contracts express or implied, declared or understood, grow all rights, all duties, all obligations, and all law. Almost the whole procedure of human life implies or, rather, is, the continual fulfilment of contracts. . . .

"Further, in all the relations of social life, its good order and prosperity depend upon the due fulfilment of the contracts which bind all to all. Sometimes these contracts are deliberately expressed with all the precision of law, and are armed with all its sanctions. More frequently they are, though still expressed, simpler in form and more general in language, and leave more to the intelligence, the justice, and honesty of the parties. . . .

"If all contracts, express or implied, were carried into full effect, the law would have no office but that of instructor or adviser. It is because they are not all carried into effect, and it is that they may be carried into effect, that the law exercises a compulsory power.

"Hence is the necessity of law; and the well-being of society depends upon, and may be measured by, the degree in which the law construes and interprets all contracts wisely; eliminates from them whatever is of fraud or error, or otherwise wrongful; and carries them out into their full and proper effect and execution."

So the courts have upheld contracts with great strictness according to the intent of the parties. *Wis. M. & F. Ins.*

*Co. Bank v. Wilkin,* 95 Wis. 111, 69 N. W. 354.  And in a recent case Mr. Justice OWEN said:

"The [trial] court found that there was also an understanding that the testator and his wife were to live with the lessees during the period of the lease.   Shortly after the testator's death the widow removed from the farm and lived with another daughter.   Because the lessees were thus relieved of the support of the testator and his wife, the court charged the executrix with an extra cash rental of $30 per year, for the apparent reason that their support was worth at least $30 per annum.   This was error.  *It amounted to a rewriting of the lease and the making of a new contract."  Will of Gehring,* 179 Wis. 589, 192 N. W. 36.

But here, it is this court that rewrites the contract of the parties and substitutes an obligation of its own choice, which the parties did not put in their contract and which they never contemplated, for the true obligation entered into by the parties.   The sanctity of contracts may no longer be held if this court can rewrite them according to its notions of what the parties should have done, instead of what they actually did.

In case of a breach of contract to devise or bequeath property the measure of damages is the value of the thing promised.   6 Page, Contracts (2d ed.) § 3235; *Thompson v. Romack,* 174 Iowa, 155, 156 N. W. 310; *Benge v. Hiatt's Adm'r,* 82 Ky. 666; *Porter v. Dunn,* 131 N. Y. 314, 30 N. E. 122; *Jefferson v. Simpson,* 83 W. Va. 274, 98 S. E. 212; *Graham v. Graham's Ex'rs,* 34 Pa. St. 475; *Dilger v. Estate of McQuade,* 158 Wis. 328, 148 N. W. 1085; Page, Wills, § 78.   The neglect of a testator to make a will in accordance with a contract is a breach of the contract which will subject the estate to an action for damages.   *Howley v. Smith,* 45 Ind. 183, 211; *Drummond v. Crane,* 159 Mass. 577, 35 N. E. 90; *Newton v. Newton,* 46 Minn. 33, 48 N. W. 450; *Wylie v. Coxe,* 15 How. 415; *Chamberlain v. Dunlop,* 126 N. Y. 45, 26 N. E. 966; *Mills v. Smith,* 193 Mass. 11, 78 N. E.

765; Page, Wills, §§ 76–78; 5 Page, Contracts (2d ed.) § 2935; Thompson, Wills, § 33.  Many more cases might be cited to the foregoing propositions of law.  But I think there is no real difference in the authorities.  The cases cited in the opinion to the contrary I think will all be found to be based on the principle of implied contract as for services, on a past consideration, or where breach of contract has been waived and action brought on *quantum meruit.*

The conclusion of the court to substitute for the consideration of the parties expressly stated in the contract an amount such as the plaintiff could have recovered under the compensation act on the theory of an action on *quantum meruit,* is wholly without authority.  There is no such thing as *quantum meruit* here.  The action was brought for breach of contract.  Where there is an express contract one may not abandon it and sue on *quantum meruit.*  And here plaintiff seeks no such relief.  On the theory of *quantum meruit* how are the damages to be ascertained?  The court suggests a novel theory of having the lower court use the compensation act as the yard-stick.  How can that be done?  The compensation act provides that the industrial commission is the only body having jurisdiction to ascertain the amount of compensation due a party.  Even this court under a request of both parties in open court has refused to accept the responsibility placed on the commission by law.  *Frank Martin-Laskin Co. v. Industrial Comm., ante,* p. 334, 193 N. W. 70.

This court assumes that the compensation act furnishes a definite and certain rule to determine the amount due a claimant under it.  Not so.  There are trials and tribulations under the compensation act as bad as under personal-injury actions at common law.  The case last cited is one where litigation has been pending under the act for nearly six years and the end is not in sight.  Now why may not the parties to this action have preferred to settle their difference even under compensation and substitute a contract obligation in

lieu of the compensation obligation?    The compensation act expressly recognizes the rights of parties to compromise their differences, and such a compromise can only be set aside by the commission and then only. within one year.    Sec. 2394—15, Stats. 1919.    This court is setting up an unconstitutional body to fix and determine compensation due *Tony Frieders* long after the constitutional board has lost jurisdiction to set aside the voluntary compromise of the parties. The fact is that *Tony Frieders* and his uncle compromised a personal-injury claim, whether under the common law or compensation does not matter; that compromise was such as has been universally recognized as a proper and legal subject of contract; they made a contract everywhere recognized as valid and binding—a contract settling a personal-injury claim such as is made every day many times.    The terms of the contract may be somewhat unusual, but be it remembered it is the terms of the parties to the contract and which they had a right to make; they were terms not only agreeable to both parties but advantageous to both parties in the ordinary course of events.    If the terms of the contract were upheld as the parties expressly agreed, substantial justice would be done.

It may be noted that since the filing of the opinion in this case the court has followed its former decisions in upholding contracts as made, even hard and unconscionable contracts. See *Brosnihan v. Brosnihan, ante,* p. 360, 193 N. W. 74, where the court says:

"The relief granted by the lower court, therefore, is such as neither of the parties contemplated, and amounts to the making of a new contract, which the lower court in the exercise of its equitable jurisdiction had no power to award and which this court cannot grant."

If it be said that the amount of the verdict is large or the judgment excessive, the court could reduce the same or grant a new trial.    But that question was not reached in the deci-

sion.   For the first time, so far as I have been able to find, this court has deliberately impaired the obligation of a contract which it recognizes to be valid under the law.

I respectfully dissent.

A motion for a rehearing was denied, with $25 costs, on May 1, 1923.